May it please the court, John Romano from the United States of America. Mr. Romano, you are a silent and worthy advocate, and you have the badge I want from you, but you just don't trust me. Maybe it's both. You'll have to ask him. Okay, I will, I will. Look to you then, Mr. Bushman. I just feel very strongly about the case. Unlike both cases. I'd like to reserve three minutes for rebuttal. All right. Thank you. The sentencing proceeding in this case went seriously off track. The district court committed three significant legal errors before imposing unreasonably low sentences on parents who Doesn't that depend on whether or not the guidelines, whether or not there's an analogous guideline under the ACA? I don't think so, Your Honor. I mean, I think Even under 3553, you think it's unreasonable? I do, Your Honor. I mean, what happened here was very serious conduct, essentially heinous offenses. Children, the ages between two months and four years old, beaten. Well, you're not venturing into territory. I assume you've seen, by the way, what happened here. There's a jury verdict, clearly. The government, were you the trial counsel in that case? I was not, Your Honor. Okay. Were you the one who tried to speak the sentencing court to the provisional officer? I was not, Your Honor. Okay. So you basically told him on the sword here. There's nothing to fall on, Your Honor. I think I'm very proud of this case. But the district court, after a 10-hour sentencing hearing, the longest sentencing hearing I think I've ever heard of, one of the longest, was convinced that she could not put any faith in the pre-sentence report. It struck fixations with the pre-sentence report for that reason because it was produced by the prosecutor rather than an independent investigation being done. So that puts us in a quandary where you're making arguments about what happened, what the conduct was, and based on that, the sentence was unreasonable. But how can we know better than the trial judge who was there what the conduct was? Well, and I have two. First, I want to address the pre-sentence report issue. The government did not write the pre-sentence report. As in all cases in the district, the government provided a statement of facts. The probation department. I thought those representations where the government was seated there wrote the factual portion. Is that not right? The government provided a statement of the facts. The probation department on its own decides what it wants to do. The government didn't sit there and make the probation department adopt the government's statement. So that's the first thing. Secondly, everyone, once the draft PSR is produced, everyone has the ability to object to it. That's exactly what happened here. So I just want to address that first. Secondly, we had a 39-day trial. The government submitted the entire trial testimony to this court. The government said, the court said that the government submitted the statement of facts. I don't know what else in terms of an analysis that was incorporated into PSR. And I thought the prosecutor admitted that they didn't write the facts. I'm sorry, I'm quoting from the defense counsel. The government submitted a statement of facts. The government submitted the memo which had within it a statement of facts, and that was incorporated. Yes, but the probation department decides whatever it's going to do. The government has no power over what the probation department does. Yes, we submitted the statement of facts. Okay. The probation department decided to adopt that because, again, this is a 39-day trial. They couldn't be there the whole time. Right. But, again, I think that's neither here nor there to the issues in this case, which are whether there's a sufficiently analogous guideline, whether the court simply refused to find aggravating facts of sentencing. Okay, let's start with that. The second part of that is related to the first part of that, because if there's no analogous guideline, then whether or not the court – that changes what the court has to do in terms of a factual inquiry. To a certain extent, Your Honor, but not completely. First of all – The trial judge did say there was no analogous guideline. Yes. And the position is entirely the opposite. But we think that's wrong, yes, and it's a legal issue. Why is it wrong? Because, Your Honor, what this court looks at – first of all, what 2X5.1 says is that finding a sufficiently analogous guideline should essentially be the rule and not the exception. And what the guidelines say is that the guidelines – But that doesn't mean you should find the analogous guideline if there is no analogous guideline. Of course. But what the guidelines say is that the guidelines that have been promulgated cover the type of criminal behavior that most such offenses, that being a similar crime, prescribe. This isn't some bizarre offense. This is a child abuse offense. There is a case, isn't there, that pretty much lays out what the district judge is supposed to do in these circumstances? The bony does that, doesn't it? I think so, Your Honor. The bony does exactly that, and the facts here are about a dispute, so the question is whether that – as a question of law, whether there is a sufficiently analogous guideline. Yes, and I think what bony says is you look at the – and what the guidelines say, 1B1.2 says, is you look at the offense conduct charts in the counts of conviction. Here, that is not in dispute. In fact, the parties and the court agreed to put that directly in the verdict sheet. If you look at the counts – No circuit has ever rejected the Osborne-Elvis-based inquiry to – Your Honor, the law is a little bit of a mess in the area. I mean, I think if you look in the – To answer that question, has any circuit rejected the Osborne test? Some courts haven't really addressed it exactly. I mean, I don't think any circuit has – This court adopted Osborne as far as the standards of review. We adopted Osborne. No, as far as the standards of review. I don't know. This court didn't say apply elements, compare elements. It never got to that because Osborne was a second-step case where we were comparing to see which guideline was most analogous. It wasn't a sufficiently analogous case. It was an Elvis-based, a cop-written – Cop-written, what is it? Cop-written. Yeah. Covenant doesn't say that because it doesn't need to get there. But, look, I think either way, I think if you go straight on 1B1.2 and look at the offense conduct, we're there. Everyone agreed what the offense conduct was as to counts 3, 6, 12. The verdict sheet says physically assaulting various objects and with their hands. When the jury was asked that question, they repeatedly said guilty. There's no doubt about that. That is within the ballpark of the assault guidelines. I mean, it is assault. The other counts, forcing toddlers to ingest hot sauce. Again, that's with the verdict sheet. If you look at the facts, you say you don't look at the elements. You look at the actual predicate. I think you could do both. What 1B1.2 says and what Boney says is look at the offense conduct charged in the count of conviction. Again, we're not talking about random allegations here. We're talking about this is the means of committing these elements, so much so that it was put directly in the verdict sheet. This is what the jury said. They physically assaulted them with their hands. That is how they endangered these children. Okay, looking at those elements, how can we then say that the assault guidelines sufficiently is analogous to the state offense which has been assimilated into our law? Your Honor, if you put the fact to fire exactly, that's where the question lies. Well, if you use the elements of precedent, again, there's nothing except for Osborne kind of said this. All you compare elements. But even if you do that, what I would ask you to look at is look at the Allard case. The Eighth Circuit decided the same exact day as Osborne, applying the elements test. They said that manslaughter was sufficiently analogous to vehicular battery. Nobody died in that case. The point is when you compare elements, you're not looking for a match. There can be no match. If we found an offense that matched child endangerment, then it would have been improper to assimilate this under the ACCA. So you're not looking for a match. You're looking for something within the ballpark. That's a good argument. Maybe I'm wrong about this, but I thought the defendants wanted to ask the jury to make specific findings as to the harm done, and the government opposed that. So what happened was there was some dispute about the statute, which is a little convoluted, and the defendants wanted it to be charged as an element, but the jury had found a substantial amount of harm. That is not an element of these offenses. So the government rightly said, no, that should not be charged as an element, but if you like, we'll put it as a special interrogatory. The defendants rejected that proposal. They wanted it to be a lesser-included offense. It's not. New Jersey law is very clear on this. It's not a lesser-included offense. Did you say before that there was an explicit finding by the jury of an assault? Well, Your Honor, the specific offense conduct, the way of committing this offense, as to counts 3, 6, and 12, was physically assaulting with objects and with their hands. See, the problem with that, and that's why I have trouble assuming it's an automatic layover with danger to the welfare of a child. It's like spanking with a belt strap or a belt. You can clearly look at just a belt used to spank a kid as being an assault. It fits clearly within the assault statute. But the danger to the welfare of a child is focused on something very, very different. It recognizes the parent's right to exercise discipline over their children. And just because he has an assault, spanking would be a trial of assault, but would not necessarily be endangering the welfare of a child. But, again, Your Honor, we're looking at a conviction here. The jury was charged that you can exercise corporal punishment. The jury was charged with a very strong good-faith instruction, whether they were doing this an honest mistake or whether this was all in the best interest of the child. But the issue is the fit with assault, animated assault or assault in battery, not animated assault, and engaging the welfare of a child under the jurisdiction of the court. The issue is the fit of those two things. Well, again, we're thinking about what Judge Roseth said, and Judge Roseth in the tenth-second read said it's within the ballpark. That's all we're looking for, within the ballpark. Because, again, we're not looking for a match. We're just looking for something that's going to help the judge. Okay. If we agree with you that the judge improperly did not use the right guideline and did not properly use the Assimilated Crimes Act the way it should have, do we just remand it back to the district court for resentencing, or is it inappropriate for us to go forward and say, based on the facts here in the jury verdict, that there was substantive due process violations as well in the evaluation by the district court in its opinion? Well, Your Honor, we think that would be very helpful. I mean, again, if this is the case, again, it was a ten-minute argument. Well, if we could do it very simply, just remand it back, and I don't know, maybe see you again in another – I don't know, are you working on a straight salary? This would be great. Look, Your Honor, there's four areas here. Any of them, I think, can justify reversing it. Is there any request for the case to go back to Judge Hayden for sentencing? Your Honor, we haven't made – you know, sometimes we ask for reassignment. That's not, you know, something we did here. We haven't asked for that here. We haven't asked for it. We think, you know, Judge Hayden is a very capable judge. We think if this court gives the proper direction that we will hopefully arrive at – Well, as long as we don't agree with the substantive violations of the court, is that premature for us to delve into that for guidance or where we are in court? It's not, Your Honor. I mean, this court has done it before, and both Goff and Weitschok have found procedural errors and then also said the sentence is just too low, and that would be very helpful here because, again, these sentences are so low that really the district court needs to be told, look, given what happened here, probation in 24 months just can't be right. But we might think – we may or may not, I don't know, conclude that these sentences are too low, but we may think that your sentence suggestions are a little off the wall as well. That's fine, Your Honor. I mean, again, this will go back to the district court. It could be argued. It could be the judge could arrive at a sentence, and it might not be a sentence we like, but it might be a sentence we live with, or maybe it's a sentence that we agree with, and the defendants will appeal. But, again, the question we're at here is, are probation and 24 months something a reasonable sentence in court? Mr. Romero, give me the steps that you say Judge Hayden skipped that she should revisit. Well, the first thing is whether there's a sufficiently analogous guideline. Again, we think that assault, whether there's a sufficiently analogous guideline is the first step. All right. And you say that's the assault guideline. It could be either assault or aggravated assault because, again, there's a cross-reference in the assault guideline that considers all the conduct. It wouldn't require a further fact-finding, would it, Your Honor? It wouldn't, Your Honor. At that point, we think the aggravated assault guideline would probably apply, but, again, that's the district court to decide. But first, sufficiently analogous guideline. Second, the court needs to make fact findings. The court said over and over again, oh, it's not the province of the court. I can only rely on exactly what the jury found in the verdict sheet. That's not how sentencing works. We don't look at the elements only and say, now I'm done. We only know that the jury found X. You have to make findings of fact. And, you know, that includes not just at the guideline step but also at the 3553A step. We're looking at the nature and circumstances of this offense. The court basically said, oh, well, I'm not going to make any findings. I don't know what happened here because the jury didn't tell me. So she didn't make any exaggerations. She didn't say she sat through the trial. It was a long-term one. It was a 39-day trial. It was. So she clearly knew what the jury thought happened in terms of the elements of defense. I thought the problem was we got beyond that into trying to apply the guidelines, and that's where the problem was. Wait a minute. Again, we submitted the entire trial record. My brief is filled with citations to the record. I really urge this court just to take a look at some of the citations. Did she apply the guidelines and come out with the same sentence? Not if this court tells her it's too low. I mean, I think it would be very difficult because, again, the guidelines will be pretty wrong. I mean, they will be. Maybe they're too low. Maybe they're not. We ask for sentences below those guidelines. But you can't say that the sentence is harmless. I mean, again, this would have been a 15-plus-year variance that wasn't stated, wasn't explained. The work wasn't done to explain such a large variance. This is totally going down a different road. Maybe I should wait for your rebuttal time. But I was troubled by the argument that you took a different view, not you, Mr. Romano, or your office. Your office, big office, very large, took a position in U.S. v. Loftin that was totally inopposite to it and actually started to have a note sent asking whether or not judicial establishment would apply here. But what do we do with that? I looked at Pages 30 and 35 of the brief that was submitted in Loftin in Texas, and it clearly is a very different position than you take the checked opposite position, because then that position matches up. What do we do with that? I don't think that that's fair, Your Honor, because in Loftin, all you had was a defendant saying, oh, a SALT guideline should apply, it's zero to six months. It doesn't dispute that. In fact, if you look at what happened in Loftin, the aggravated SALT guideline probably would have applied there. So the guidelines analysis was not done. So I don't know that 48 months was over what the aggravated SALT guideline would have supplied. So that's first. Secondly, the fact that a U.S. attorney's office in a different district took a different view of a different statute really has nothing to do with us here. Well, you made a point on Page 12 of your brief of telling us that the Solicitor General personally approved the appeal. This appeal. This appeal. This appeal. Yeah, and as you know, in defensive appeals, U.S. attorneys' offices file briefs that don't get reviewed by the Solicitor General. We think that their view in that case was wrong. If you look, they simply matched elements and said, oh, these have different elements, there's no analogous guideline. That's not how you do the analysis. Well, you're not saying that the U.S. attorney in another district did a 180-degree different. No. You're not just saying that in this district. Well, you are. Again, what we would point out is that the Solicitor General personally approved this appeal, personally approved the position we're taking in this appeal. I was wondering why you troubled yourselves enough by letting us know that the Solicitor General personally appealed. It's sort of a marvelous sentence. It's buried at the end of the sentence at the bottom of the page, but I wonder why that was relevant. I think that that's actually what it says in the statute, Your Honor, that the Solicitor General personally approved sentencing appeals. I've never seen that in the brief before. Maybe I just overlooked it. Do you want to answer any other questions? I have a note here. Is it accurate that the conduct involved in this case resulted in fractures? That's what the experts say. Who's the expert? We have two experts. That's not how it was debated. Your Honor, a lot of what the defendants say was debated, I think. Well, the defense, and that's, I think, part of the problem, that there was harm and there was some doubt about origins of the harm. There was one expert who said that one of the fractures was too old and it may well have been inflicted prior to the time these defendants took custody, and the person who took custody at that point was a recognized child abuser. Those are the kinds of things I thought would trouble Judge Hayden. That was why he had problems with the facts. There were certain things that came out of trial. These things were all disputed. This was litigated at trial, a 39-day trial. Some of these things had nothing really to do with the substantive offenses. So some of Joshua's injuries are part of a conspiracy, but they're not part of substantive offenses. The government thinks they prove that at least by a preponderance. I mean, there's an issue with the bottled-up fracture and there's an issue with some fractures. Again, even if you put them in a sentence, I've seen the government say literally, you can put those things aside. Don't even worry about those. If you don't want to deal with them, don't. Look at just what we know happened here. The expert just really wasn't objected to or was requested by the defendant, was he? Well, they certainly didn't put on their own expert. I mean, there was no expert on the part that I'd say the expert was off the wall on it. No, and some of the stuff that they raised in their brief was, I think, very quickly rebutted by those actual witnesses. I'll give you an example. They say, Dr. Corey testified that C, a refractory of C, received too much milk because Carolyn was mixing the milk with the formula, and this increased her sodium levels a certain amount. Well, Dr. Corey testified on cross and then on redirect that even if C got more sodium that way, it had no effect whatsoever on her astounding sodium levels. So they put that in the brief and said, oh, there's a dispute and there's a question. I'm not sure at all. The witness was very clear on that. And I would also point out, if the jury believed that, then they would have been acquitted of those counts. If, you know, mixing milk with the formula. How about your submission, because that troubled me. What is your submission in terms of the cause of the sodium levels, based upon the jury's verdict? What got the sodium levels elevated? They were forcing her to ingest hot sauce, which has a lot of sodium, and not giving her any water. And the witness has said this would take days for her to get to that level. And again, I mean, they said she arrived at the hospital at death's door, more of them, floppy. If you look at the pictures, the pictures were taken three or four days later, and she still looks awful. And they said when she came in, she was that much worse. And again, this happened before, so this isn't even the first time it's happened. It's the second time. Again, so I would just say, look, the conduct here is so awful that these sentences are too low. And again, if you have questions, I would ask you just to look at the evidence brief. It has filthy dissertations to the record. This was not, in all due respect, a close case of liability, because what happened here was really beyond the pale. And again, I would also ask you to look at the growth charts in this case, which weren't even disputed. And, you know, you're always talking about, you know, the judge had issues of sentencing. The judge doesn't talk about any of this. Look at the sentencing. See if you see anything about the child starving. Starving. And in summation, the defendant can't even really respond to that. Look at the growth chart. It goes like this. Says nothing about it. Look at the sentencing transcript. See if the judge does anything about the defendant's lying to all the doctors. That doesn't come up either. And what the judge does say is, this wasn't serious. This didn't really harm society. You know, the United States is basically different on that point. Thank you very much. Thank you. Good morning, Your Honors. Herbert Waldman, General Dunbar-Gaffert for Calvin Jackson. Before I begin my work, I'd like to correct a few things that Mr. Romano said in response to court's questions. First, were there defense experts that disputed those of the government? Absolutely there were. Matter of fact, they were the treating doctors that we brought in from Oklahoma, who disputed the government's experts as to what the cause of various conditions were, particularly of Joshua. Was there evidence, as Mr. Romano said, the sodium level was so high because of hot sauce? Not so. The doctor, Dr. Corey, said he didn't know what the sodium content of hot sauce was. That's what he said, and you have a government expert saying what the sodium content is. Isn't that, and you have a jury's verdict, why would we have grounds to question their supposition as to the cause for the elevated sodium levels? Well, I don't know what could have caused it. The government expert said, I'll tell you what caused it. It's the high levels in the hot sauce. Well, but he didn't say that. That's what I'm saying. The expert didn't say that. Dr. Corey didn't say that. It's obvious that's what the implication is. I don't think so. Not from the medical records. Not at all. There wasn't a testimony that there are high sodium levels in hot sauce? No. There isn't. We explored that in the trial. Mr. Romano is making this up. He's incorrect. Well, what gave it such a high sodium reading? What caused it? Yeah. Well, I can tell you what's not in the record. The girl had a hypodermic episode in Indiana. She had a condition known as granular casts, which Dr. Corey never picked up. Her kidney was not functioning well when she returned to New Jersey. They never had a test to see whether it was cleared up. If none of that's in the record, the jury's not going to know that, Margaret, and they would just rely on the government expert. I'm sorry. If none of that is in the record, the jury's not going to know about it. That is in the record, that she did have this condition in Indiana, that Dr. Corey never realized until he was cross-examined about this condition of granular casts, and that it was in the record that no tests were ever made, never conducted, to see whether she was better. You don't disagree that the sodium levels were extremely, extraordinarily high and abnormal. Absolutely. And that the child's growth rate was also abnormal. Absolutely. But there's nothing in the record that really answers the question that was asked to Mr. Romano, why were they so high, and that there are alternate explanations for why they're so high. Like what? Like what makes sense as to the growth rate and the sodium level and the other physical attributes of being mishandled? I have no quarrel with the growth rates. I have no quarrel with saying we sent a trial. Carolyn Jackson was not a good mother. She had her own ideas of nutrition. She had her own ideas about child-rearing, and they were wrong. But if you want to get into the weeds of it, and did what she did cause the high sodium levels, it may have because she added the milk instead of water to the formula. What about constant striking of the child causing fractures? Physical assaults and beating an actual child with a belt. Why isn't that an assaultive behavior, regardless of a parenting purpose? Well, first of all, we dispute, and the records dispute, is in dispute as to causes of fracture. One of the fractures that they claim to see, the jury found the defendants not guilty of not getting proper medical attention because of what was mentioned before that thing. But the jury did make a specific finding, I hear this morning, that there was a physical assault on the child, on the children. There was no question that corporal punishment was used. That was clear from the start. What's not clear, and the jury verdict didn't determine, is did these really serious injuries, these really serious conditions that the children have, were they caused by the defendants? Why wouldn't the jury's verdict determine that? Because they didn't have to. If they found the defendants guilty, doesn't that say that they were caused by the defendants? No. Oh, absolutely not. Absolutely not. The jury found them guilty, but the injuries might have been caused by some other factor? Absolutely. That's what our witness from Oklahoma, Dr. Mantor, the best example is the bile duct. They claim that it was caused by hitting the child with a sharp object, a blunt object, in the abdomen. The defendants admitted from the start they used corporal punishment on the child, but they said they didn't cause that injury. We brought in the surgeon who repaired the injury, and he disputed the government's experts. Yeah, but you can't get over the jury verdict, which found him guilty, and if they're found guilty, you've got to conclude that the conduct was beyond corporal punishment, which is administered by parents and even allowed under state law. Under the jury charge, the jury found, could have found, and this is the problem. No. Well, the jury found them guilty. That means that they did not do, the result of these physical injuries  No. I don't think that's true at all. No, it's true. Excuse me. If they didn't, the jury would have found them not guilty. No, I can tell you why that's not so. The jury charge said, if you inflict unreasonable corporal punishment, what's unreasonable? Testimony from the government's cases, for example, Joshua, the first adopted child. He would get spanked when he didn't get into his car seat quickly enough. The jury could have very well found that's unreasonable. Doesn't mean that they found that he caused a bile duct fracture when the doctor who treated him for it said it couldn't have happened the way the government claims. And as Judge McKee points out in Olowski, you give great deference to the treating physician. The treating physicians, and Judge Hayden emphasized this, said we have to recognize the fact that the treating physicians who saw these children at the time, and treated them for these conditions, didn't think that there was abuse. So, the heart of the problem is that the jury, we, and Mr. Romano is wrong and this is wrong, we were the ones who asked for special interrogatories that weren't given. The government didn't ask for special interrogatories. They argued against special interrogatories. They wanted a bifurcated procedure. They wanted the jury to come back later And five, did they create substantial harm? New Jersey's child endangerment statute can involve a whole range of conduct. There can be incessant scolding of the child and it could, on the other end of the spectrum, involve very serious injury to the child. It is at the other end of the spectrum, I think, that the government is arguing here that was given to the jury and they need a jury finding. Why doesn't, in those circumstances, this is the assault sentencing provision apply? Yeah, because the incessant scolding would not get the level of assault. Yeah, this is, you know, we claim that this is on one end of the spectrum, where there was horrible punishment and it may have been excessive, but it didn't create the serious injuries. Take it as a hypothetical. There is serious injury to a child under the endangerment statute. In that circumstance, very serious injury, why doesn't the assault sentencing provision apply? Well, why wouldn't it, let's say, because you're speaking of a hypothetical. I mean, the question is, is that analogous to... If that's the question, Your Honor, I don't think it's analogous, and my co-counsel will discuss, and there's been some discussion about the elements. I think Judge Hayden made a very interesting and profound observation, that this statute and the assault statute are just completely different animals. That was her parents' patriae analysis, and the analysis is that normally, one person can't strike another person, but in the case of parents disciplining their children, they can. It's a totally different... Well, you can strike your child, but you can't do it within the parents' patriae provision. And you... Pat Bonham, you are arguing that the jury verdict here did not find cruelty or neglect. That's what you're actually saying, that it was not finding cruelty or neglect. And I'm having a little trouble with saying that this verdict does not do exactly that, I'm saying that whatever parental guidance was given to these children was beyond that which was necessary, and was actually neglect or cruelty, which is very similar to assault. I don't disagree that they found cruelty or neglect, that's what they were charged. What I'm saying is that they didn't find that these serious injuries were caused by the parents, and that's a very different story. But they did find cruelty or neglect by the verdict. They did. That's what they were charged with. They weren't charged on assault, and they certainly weren't charged that they had to find the cause of these injuries. You're saying they weren't charged on assault? They were not charged on assault. Who were they convicted of? Who were they convicted of, and how was that defined? The court read a sort of generic jury charge for each of the counts, which described the elements of cruelty and neglect. And they were never... The only way that assault had to be assumed is that some of the counts said they made them a... The definition of cruelty and neglect is usually specific, but for those counts, the jury was never charged either what assault means or, more importantly, that they had to find that certain injuries were caused by the assault. But that's the verdict itself. Don't they find that there's cruelty or neglect? And isn't cruelty or neglect not exactly the same, but within the guideline definition of assault or similar to assault? No, because you can be... The jury charge has a lot of ways... Judge Hayden said they're vexing, harassing a child. Cruelty is a whole range of conduct that are completely different than assault. Well, what is the difference if you are so cruel to someone? To have an assault, you don't actually have to have a hitting, a striking. You can assault someone without having physical contact. You can threaten them. You can threaten them and you can deny them what they're entitled to and so forth. That's similar to assault, is it? It is, but the difference between that and the child endangerment statute is that, and I guess in a brief, parents probably in every state and every day assault their children in the sense that they threaten them and, frankly, they probably strike them. The corporal punishment is widely employed more in some regions of the country than others, but that's not what the assault statute is... But you don't suggest that the child endangerment statute does not embrace or include the assaultive conduct. You're imitating that, are you? No. It's the equivalent of the honor of other things. Other things as well. And just as an example, how would you apply the guideline? How do you look at, for a heartland analysis in assault, which is when the assault guideline itself never considered the parent-child relationship? Easily, because it's an allure where there was a manslaughter conviction and we discovered that involuntary manslaughter was sufficient to a battery, even though for manslaughter, someone's got to get killed, and we found in Howard that it was sufficiently analogous to the battery guideline. Well, a manslaughter has to have a battery also, I assume. Yeah, but in... In child abuse, the statute aims at different things, at different societal problems. The jury explicitly found that there was assaultive conduct in this case. Well, that... And it's hard to say for sure because they certainly were in charge that they had to find assaultive conduct. Now, how do we discuss the guideline? What exactly happened? What did you request? What did the government oppose? It started in the discussion of the jury charge. Our proposed jury charge was structurally very different than the government's. Number one, we said that in order to find the defendant guilty of child endangerment, they have to show that substantial harm was either caused or threatened. We got that from the Moral Penal Code, which the New Jersey statute was based on, and on case law. The government took the position that they had an option. They can either charge as we suggested or under the same statute, they can charge... They don't have to use that statute that we relied on, which was incorporated into the criminal code. And they could charge that the jury only has to find that the defendant did an act and not that substantial harm was caused. That's how it started. Wait, that makes no sense. The defendant did an act? Well, did an act of cruelty... That's important. And so we said the act of cruelty has to cause a substantial harm. Otherwise, if I have a fight with my teenage son and push him, that's an assault. So first you have an act of cruelty and then you have a resulting harm, is that it? You have to have a harm. That's an assault. But we said that under the child endangerment statute, you're talking about a very serious crime. The government assigned this second-degree crime. Pushing my teenage son is not what the statute intended. So then we lost an argument. We got to trial. We got to the portion where we were having summations and jury charges. And the government wanted to have a bifurcated format where the jury was charged, as they ultimately were, and then they would come back and if they found the defendant's guilty, they would then be asked, do you find that they caused substantial harm? We said what we would like is for the jury to get special interrogatories. And while they're deliberating guilt or innocence, they would also make a finding of whether there was substantial harm or not. Judge Hayden did neither. And that's how we ended up where we are. So as she said, we don't know what they found. We do know that they found that they went over the line in terms of the use of corporal punishment, but we don't know if they found all these serious injuries. She attributed this, if I remember the opinion correctly, to the state of bad parenting. She thought that there was bad parenting in the sense that they were using corporal punishment at times when it was not necessary. But how could you look at the conduct here, which was engaging, and say that's bad parenting? It is bad parenting. What they did was intentional. It was intentional. And you can't call this, you know, bad parenting, that the injuries which were suffered by the kids is not usual bad parenting.  between the bad parenting and the injuries, and that's what she said she couldn't find. And you're saying the jury's verdict did not... Go ahead and ask the question. The jury's verdict resolved that they were guilty of these offenses, of bad parenting, and beyond bad parenting of assault, if you believe the guideline is analogous to whatever the guideline was. The assault guideline is analogous to the conduct of this case. If you do, but the jump that the government wants you to make is from assault to aggravated assault. And that was really... That's a matter of fact-finding, isn't it? It is, absolutely. The court did not do that. The judge said she did not do that because in this case, and I think it's a very narrow situation, the government structured the trial and the charges so they didn't have to charge the statute, this is what they said, that included the substantial injury. They said, we can try this case without proving that the defendants caused a substantial injury, but then when it comes to sentencing, we can ask you, Judge Hayden, to make these findings a fact that they caused these injuries. I have a hard time accepting that that's what really happened. I can assure you, Your Honour, that's just what happened. And I find it incredible that that's also... What is wrong with that is after the verdict comes in, the judge then must determine whether or not the conduct found by the jury is within one of the guidelines or is outside of the guidelines, and she relied basically on state law for sentencing. She didn't rely on the guidelines. And if it's an assimilated crime and there's an analogous example, she has to go to one of the guidelines if it is analogous. She found that assault was not analogous. To me, I don't know what would be more analogous under the guidelines than assault in this case, if you agree that the conduct of the parents was beyond their parenting or mistake. Well, in a sense, I agree if you say, I don't know what would be more analogous than assault. I can understand that, although we disagree, and my co-counsel will talk about the element analysis. But what I do disagree with strongly is that aggravated assault is an analogous guideline because this is what we wanted the jury to determine is whether these defendants caused that substantial bodily injury to the children. We claimed that the substantial injuries that were caused were not caused by the defendants, and we felt that we had a right to have the jury determine that, first, as an element to the offense where we lost our argument, but second, as a matter of sentencing. And Judge Hayden, when we discussed the jury charge, Judge Hayden told the government, if I go with your analysis of the elements of the offense, there's going to be consequences when it comes to sentencing. You're going to have your finding of guilt, but you're not going to have your finding that they caused a substantial injury. And the government was satisfied with that, until it came time for sentencing. And then they said, even though we took this determination away from the jury, you, Judge Hayden, can make those findings. You can find whether the defendants caused the bile duct perforation, or whether they caused, after the sentence, 28 day minutes, is pointing us to the record of exactly where that interaction occurred, what you just said, where the jury said, okay, if you have that record, there will be consequences. It's in my brief, Your Honor. Okay, I missed it then. Yeah. Is the citation in the record? Yes, it is. And they said, she said, you'll have your, I forget exactly how she phrased it, but she sort of told the government what they were getting themselves into, what position they had maneuvered themselves into, and they were satisfied. Then they wanted to come back and say, we want a judge to find all these serious injuries, and in a case where they structure the charges so that they can avoid a jury determination on exactly that issue, we don't feel that it's appropriate or proper or constitutional to come back and say, let the judge make that determination. And one of the reasons is it's traditionally an element of the offense, the amount of injury, and did the defendant cause that injury. That's a traditional element of the offense. It's Jones versus the United States, you know, saying that the degree of injury is a traditional element. You can't take that away from a jury by the way you structure your charge and then come back and try to sentence them. Isn't it the case that elements of a crime increase the maximum statutory sentence but don't necessarily affect whether it's a serious assault or not? Well, I think that there are different definitions, I guess, of the elements of an offense, but certainly the way I'm using it is the amount of injury that an assault victim suffers and the defendant's responsibility for inflicting that injury has traditionally been considered an element of the offense. But doesn't it affect whether it's a serious assault or not in the range of the sentence that the court has? Sure. The more serious the assault, the more serious the danger, the greater the extent of the injury to the victim in almost every jurisdiction. That analysis was not performed by the court in this case. Pardon me? That analysis was not performed by the court in this case. It wasn't because Judge Hayden said, don't ask me to determine whether the bile duct injury was caused, as an example, by these defendants when you didn't want the jury to determine it. Before you were focusing on elements and I'm wondering whether that's the correct focus. Well, I don't think it's, you mean, whether that was an element of the offense? Well, you were arguing before that she was not, she did not distinguish the elements of the offense. And I'm wondering whether that's relevant or not. No, I think it's relevant. What I'm saying is that courts have struggled since Apprendi and Booker with how to, the judicial fact finding. And I think that some of the unique elements about this case are, number one, the government's ability to structure the charge by choosing what statute to charge under. And number two, the fact that unlike maybe some other cases, the harm suffered to a victim inflicted by a defendant has traditionally in Anglo-American jurisprudence been considered an element of the offense that a jury has to determine. That's different than, let's say, even a drug case, where that doesn't have that type of analogous history. There are certain actions and certain elements that are given to the jury. Not necessarily. Not necessarily. Jury's verdict can find people guilty without finding specific acts. Your basic position in this case really rejects the jury verdict of guilty. The jury verdict of guilty finds that whatever injury was suffered by these people was a result of the conduct of the parents. Now, exactly what conduct that was, the facts are in dispute somewhat, maybe. I don't know. But with that, you're arguing the fact that you got a, if your argument were correct, you would then have a not guilty verdict. You wouldn't be standing here. I don't agree at all. I'm sorry. We agree that the jury verdict that. What did it result in? Did you find guilty of the conduct resulting in this injury? It resolved, for example, that the defendants used excessive corporal punishment at inappropriate times. So if a child spilled something at the table, for example, and a kid would get smacked for that, then the jury determined that that crossed the line and they're guilty of child endangerment. But there's no endangerment unless the kid gets injured from that smack. When you get a kid and there's no injury, there's no consequence to the alleged improper. Here, the jury found. Under the jury's tension, the reason they didn't find neglect. It doesn't require an injury. That's right. The jury didn't have to find an injury. But they found neglect. At the very least, they found neglect. They did. And they've got to find an injury as a result of that neglect. Neglect and cruelty are two different elements, two different paths to a guilty verdict. There were neglect charges, and the defense would have that guilty of neglect charge. The charge would be, in my hypothetical, where the child spills something. It's not even a hypothetical. I think it's in the record. The child spills something and the parent employs corporal punishment in a totally unreasonable time, in a totally unreasonable way. There's no injury to the child, but under the statute that makes the child one who cruelty was applied to or done to or have been run afraid. That's an act of cruelty to use corporal punishment at an unreasonable time in an unreasonable manner. Even though there was no injury. Correct. That's how the jury was charged. We don't agree, but that's how the jury was charged. So that's why it's so ambiguous as to what they found. What exactly happened with the pre-sentence report? Was it just that the government supplied a prosecution memo and the statement of facts and the PSR? Was they taking the prosecution memo? Is it your impression, anyhow, Mr. Romano, or does it agree the government actually wrote that and they gave it to his parents and they had to find who wrote it? Well, perhaps it was the pre-sentence report as far as the facts were concerned. When we got the pre-sentence report and saw the factual recitation, we knew that that couldn't have been done by an independent, neutral source. We inquired. We found out, and the government conceded, that they wrote that portion of the reading. They sent them a memo stating their factual prosecution memo. We had some opportunity. We were curious, let's say, as to how much they incorporated it verbatim, and we asked both the probation department and the government to give us a copy of their memo so we could see whether they're copying word for word. I'm not sure if we subpoenaed it once. I know we had discussions. We wanted to make that comparison. The government said that they wrote that type of narrative. They say it's standard. Judge Hayden was unhappy with that, and she said, I think absolutely correctly, this isn't a factual narrative of what happened. This is your contentions about what happened. This is argument. She asked, and it was Mr. Romano, I think, why did you do this? What's the purpose of this? They said, this is my brief. They said, well, if this case goes to the Court of Appeals, they're going to want to know the factual basis of what this case is all about, and so we supplied this to them so that they had that factual basis, which to me compounds the error. Judge Hayden said, this was not done properly. We had a briefing about the way the probation manual sets out what they're supposed to do, et cetera, and this was totally improper. She struck it. Two nights later, when he met the room, wrote, said the prosecution wrote. They sent a written submission. A prosecution note. A prosecution memo. To the probation department, which without any independent analysis at all, as far as we know, is just talking over their PSR. Yes. Okay. And then that's why she struck it, because it wasn't done on an independent basis. It was an advocacy case. She was saying that where there was countervailing testimony, for example, what happened with the bow back injury, that should have been in the PSR. At least the judge should have been alerted to the fact that this is contested, but the judge said to the trial, I knew that was contested. I'm sorry? The judge said to the trial, I knew that was contested. Sure. But we also were concerned it was going to go with our client to prison. It was going to come up to this court. We submitted a very long objection to the PSR, besides on the legal basis that they should do their own analysis of competing, you know, narrative of what happens. A probation officer gets both positions, or positions for one, they can adopt it or not adopt it. This is routine. I mean, I've seen it dozens of times myself. Well, the manual for the probation department says you're supposed to make an independent investigation. Yes. No, that's what they're supposed to make. But very often an independent investigation will adopt the dependent or the prosecution's position totally. I've seen this. It's no secret. They could. But at least there's some thought into it. Here, I don't think there was any. I mean, I can appreciate it. It's a long trial. How are they going to go through the record? But the government, I think, overdid it by putting in a lot of their arguments and their contentions, which really weren't based on the record, and it's what they hoped a fact finder would find. I think that goes back to the initial discussion over the charge where you wanted the jury to make specific findings as to the injury, and they opposed that and they wanted to do it in the bifurcated process you talked about. Yes. Well, the equivalent case is routinely a verdict of guilty can be rendered, and essentially the judge has to find the facts which go to the appropriate guideline, and whether the facts further justify their answer or whatever is appropriate for a sentencing. That's done routinely. Certainly. What is wrong with the procedure here, then? Well, the procedure here was that the government swatched the case so that certain crucial facts, which are normally elements of the offense. Quotation. Quotation. Yeah, quotation, and extent of injury, away from the jury, and the government then wanted the judge to find those facts on a lesser burden of proof, and we contend that that can't be done without violating the Sixth Amendment. Okay. Well, it goes back to that and more recent cases, and we feel that that's crucial fact-finding. When we started the case, that's what the whole case was about. No question that these defendants hit these kids, but we contended that they didn't cause all these serious injuries, and the government claims that they did, and we're here years later, and that question has never been resolved, and we feel it's inappropriate after one-and-a-half jury trials to have a judge decide that. You don't think the jury decided quotation in this case? They didn't, and Judge Hayden said they didn't. She said, I don't know what the jury found, and Judge Hayden put it on her own, submitted special interrogatories, and asked the jury to establish causation. Sure. Did you find there were injuries here? Tell us whether or not you conclude that the injuries were caused by the conduct. If you find defendants engaged in the conduct, you can go further and tell us whether or not any injuries that you find were caused. Absolutely, and we wanted that to happen because we felt that the jury's arguments were wrong. If the jury had come back and said, yes, we find them guilty, but none of them find substantial injuries, we would have been up here arguing. Well, they're convinced that that's not an element, and the jury shouldn't be a part of it. No, and then they'd have to decide that issue. Well, the government wants to try it one way, you want to try it the other. Both you and the government are entitled to a fair trial, but not a perfect trial. Absolutely. And no one got what they wanted, but the question is whether or not you got enough. You always talk about it in the chambers. Well, we didn't appeal the jury verdict. We said that we'll go forward, and the government took us here on the sentencing issue. We feel that the sentence, if I could just, I don't know, overstep my time, but they had me about an hour and a half ago. Judge Hayden was, I think, the only one in the courtroom who had extensive experience, both in her private practice and on the bench, dealing with family court issues and with abuse cases such as this. She has sentenced defendants in New Jersey courts. We all know Judge Hayden. And she imposed a sentence which very closely mirrors the amount of time that Carole Jackson would have spent had this case been tried in a New Jersey state court. That's what she should have done, and that's what she did. And at the end of the day, Did she say in the record that that was the purpose of the sentence? That that was the purpose of the sentence? Right. Does the board of attorney find that she did anything like this? I think that she said that that was what, she talked about how she would handle this case if she were in a spirit of court. Okay. Well, she said she would give these defendants, I think she said seven years. That actually translates to less than 24 months that she got. And we think that was the appropriate. Okay. Thank you. May it please the court. My name is Louise Arkell. I'm an attorney with the Federal Public Defender's Office and we represent, Pull it down a little bit. Pull it down? Okay. We represent Appellee John Jackson. If I could turn to the analogous guideline question, it's an extremely straightforward analysis. And if I could give two examples, I think I can show why the government's approach of within the ballpark is not the appropriate approach. Assume for a second that endangering is a federal statute and assume that the Sentencing Commission applies, specifies, assigns the assault guideline to it. Courts would have to apply the assault guideline. That was part of Amendment 591. The government, however, concedes that the assault guideline was inappropriate for all the counts of omission. That illustration, I hope, and I'll pause. All the counts of omission? Sorry? All the counts of omission. All the counts of omission. The counts of omission. We don't have to agree with that if that's the government's position? I think that's an analytical thing. It makes sense. We don't have to agree with the government if that's the government's position? You don't have to agree with the government's position, but I think it makes sense because... But you're presenting a hypothetical, aren't you? It's a hypothetical. So how about the commission? The commission, the government, argued that the guideline applies. My point with the hypothetical is that it goes to show that the guideline should apply. You look first. The first determination of whether a guideline applies, you look to the element. That's what makes sense. It's consistent with the structure of the guidelines. It is totally consistent with how Amendment 591 tried to clarify the application and that initial determination. It's not as if you don't ever consider actual conduct. You can consider actual. Let's say a guideline does not apply. You can consider actual conduct within 3553, but the distinction, and the distinction I think the government was making with its crimes of omission, crimes of commission, is that you're looking at the means. There's a difference between looking at the elements and looking at the means. First step, you look at the elements. And that's why I think that hypothetical, that it would violate the very application of the guidelines is the crimes of omission, and I think it's clear that like failing to do something. And omission is a way of committing cruelty as well as neglect. To apply the assault guideline, I don't think the commission would apply, would assign the assault guideline to an endangering statute, structured as the New Jersey one is, because so many ways of committing the offense do not rise to the level of assault. Failure to provide a coat during the wintertime. That would violate the statute. I'm sorry? Failure to provide a coat during wintertime. Right. That would not violate the statute. Yes. Under the guideline application instructions, the court would have to apply the assault guideline to all of those counts. You say you have to look at the elements first? Yes. I always think of the elements as the facts that increase the maximum statutory offense. I don't look at the elements, if necessary, in this case, as opposed to find the facts to determine or look at the facts to determine which guideline should be applied. But it is. The application instructions do provide that you look at the elements. Elements are things that have to be found by a jury. Isn't that correct? Correct. I'm sorry. And I'm not making a Sixth Amendment argument. This is purely do you get into the guidelines. Many of the government's cases involve where there are multiple guidelines, and I think that is a somewhat trickier inquiry. We are looking at whether you ever get into the guidelines. Assault is not an element of the endangering statute. The jury was not instructed about assault. I am not saying that some of the conduct prohibited by the statute does not rise to assault, but the elements. So what value does element have? If the state statute is very broad, it could be just meeting a child unattended, and it could be serious aggravated assault, why then don't we focus on the facts rather than elements? Well, I think that's a decision that the commission made in structuring the entire guidelines, that there is some value in considering what the elements of an offense are in assigning guidelines. First you look at what they call the charge offense conduct. Then you look at the real offense conduct or the actual conduct. That is how the guidelines. My other, I said I had two examples, because the other way of thinking about it that I think helps show why the government's approach doesn't work, is what if the commission were to assign, to design, I should say, a guideline for the endangering statute? This is how I think it would work. It would assign a base level to the endangering statute, designing to cover sort of a mean or a median, I don't know, an average of what might cover the conduct in the statute. Then it would design specific offense characteristics. So for inflicting unnecessarily severe corporal punishment, you might get a point, you know, plus two, plus four. For not providing the coat in the winter, you might get a minus two, a minus four. That's how the guidelines work. Here you do not get into the guidelines because assault is not an element. Furthermore, I would also say it's a perfectly- What if an assault is not an element but an assault occurred? If an assault occurred, you can, under the guidelines, you mean under my hypotheticals, you would get under the endangering, assuming the guidelines provide an offense level, assuming the guidelines assign a guideline to an endangering statute. You get into the guidelines, you have your offense level, and the guidelines say, under specific offense characteristics, if an assault occurred, if the crime was committed by inflicting overly severe corporal punishment or anything else under the statute that would constitute, that would rise to the level of assault applied, you enhance the base offense level. It happens all the time under the guidelines. That's how, like I said, that's how the guidelines work. So you wouldn't be unable to consider it.  Here, there are so many ways of committing the element, the offense element of cruelty and or neglect, that I don't think the commission would assign a guideline for that. And if they did, they would deal with the means of committing the offense by way of specific offense characteristics. If you engage in neglect of a child without assaulting the child, you engage in neglect, but you reasonably should know, as a result of that neglect, the child is going to suffer injuries. Why is that sufficiently analogous to the assault statute, the assault guideline? Because I think assault has a meaning. And because the guideline instructions tell you if you look at the elements and if it doesn't meet the elements, it's not an analogous guideline. Well, it doesn't have to be exactly analogous. As I mentioned, we applied the manslaughter guideline to an assault, to a case where manslaughter requires that someone get killed. And we said that's sufficiently analogous. To me, it's a better compliment. If you neglect the kid, the kid is going to have some sort of physical injury. And if you reasonably should know that, you've assaulted the kid. You've only neglected the kid, you say, but in reality, you've assaulted the kid. What's wrong with that thinking? I think Allard, which I assume you're referring to, is a perfect example of why, of the power and the clarity that Amendment 591 provided. Allard predated Amendment 591. 591 says actual conduct should be taken into account in Step 2. Step 1, do not look at actual conduct. And that would be a matter-of-fact finding. Specific offense characteristics are a matter-of-fact finding. If you get into the guidelines somehow by way of, or in that case, my argument would be you don't get into the guidelines. But if you do get into the guidelines, specific offense characteristics is where you take that into account. I'd also like to point out that I think Allard, and a lot of other cases, I think an important piece of this argument, or this case, is that a lot of these cases predate Booker. And I'm not talking about Booker in the sense of the Sixth Amendment argument. I think the fact is that a lot of these cases occurred before 3553 was an integral component of the sentencing system. And I think 12 years after Booker, maybe it's hard to remember, just how invisible, in a way, 3553 was. Now, we all speak, fluent 3553. It is a fully developed, fully structured body statutory provision that takes into account all the purposes of sentencing. It is no longer, plus, I mean, the most important thing is that is what the guidelines tell courts to do. Even under 3553, the sentence was unreasonable. And at that point, I assume you said, I mean, that once you get into 3553, in order to apply it, you've got to, the judge in certain cases has to make a determination based upon a comprehensive evidence of what happened. Was that there was a causal relationship between the injuries and the neglectful conduct? And I think this judge did. I think this judge, as you pointed out, this was a ten-and-a-half-hour sentencing hearing. This was a judge who had lived with this case for two-and-a-half years. Heard, I believe, if I counted correctly, 45 witnesses who held, and at the end, and heard and observed and reviewed thousands of documents, including expert reports, heard experts. She made a determination. It's not that she didn't make a finding. She determined that the causation was not established sufficiently to her, It's not that she ignored them. She found that the government hadn't made the case for causation sufficiently to weigh those factors and make it entirely clear. You're saying it wasn't established by proponents of the evidence. That's what you're saying. I'm sorry? You're saying that to their mind, the causal nexus wasn't established by proponents of the evidence. Yes. And I don't read the government's brief or argument to be complaining about specific findings of fact. Also, what I haven't heard is that what the judge did was essentially reject the government's characterization of this case. The government tried an endangering case. The government came into sentencing and talked about torture. She rejected, she clearly rejected the idea that this was a systematic campaign of torture. And was there evidence in the record to support that? Absolutely. She said the live doctors who saw these children at the time, the neighbors, friends, family who saw this family at the time, they didn't find what the government is characterizing, which was an unrelenting, systematic campaign of torture. Furthermore, absolutely central to her imposition of sentence, especially on John, was his military record, which the government treated quite dismissively at times. She noted a 22-year career of military service and service to this country. She took that. Where does that get you? That could cut both ways. And she recognized that. I'm glad you bring that up because she looked at him and she said, you failed to protect your family. She saw that. She said that adds to your culpability. She considered his culpability. She was quite, that was a withering assessment of a man's failure to protect his family. She took that into account. But she also said she was beyond failing to protect. And she acknowledged that. He's been injured, almost retabbed. She acknowledged his culpability as reflected in the verdict. She was quite clear that she accepted the verdict. She summarized it at points, and we cite that in our brief. I'd also like to say that she. Was there not a direct witness to the assault? A child? JJ. Who testified at the sentence and asked for the maximum sentence. He did testify, and she took that into account. She credited some of his testimony, and she didn't credit some of his testimony. She credited, for example, that JJ had asked John to speak to Carolyn and try to help her be more gentle. That is where, that was part and parcel of her assessment of him as failing to protect. And she said, you'll have to live with that. On the other hand, she did not credit all of his testimony. She also considered a sort of central pillar of her sentence on John was all he had lost. She took into account the fact that this was a man who lost his career. His career was essentially erased. It's not as if you just can't practice your job anymore. His career was erased by the other than honorable discharge. He lost his pension. He lost his veteran's benefit. He lost the ability to speak, to point to pride with his, to his military career. Judge Hayden could not have been more thorough in her consideration of the sentencing factors. And in the end, her reasons for imposing the sentence were logical and consistent with the record. That is all that substantive reasonableness review requires, and I urge this court. My problem with it is that I'm too much of a man. The sentence always bothers me. It doesn't because I'm lost. It basically has two systems of sentencing. The CEO comes in with a whole bunch of chips that he or she can put into the sentencing pot. Lost my job. Lost my pension. Lost my career. Lost my position I can't get into the country club anymore. Didn't nobody play golf with me. Got all these chips you can play. The poor slob from the corner who comes in because they work at the mortgage office all day, they've got no chips to put in the sentencing pool. So you end up with a system where you've got chips to put in the pool, i.e. you're privileged in some way. You walk out the door. You come in and you have no chips to put in the pool. You're not privileged. Prison. That's my concern with that line of sentencing. It bothered me historically when I was a sentencing judge. It bothered me. It bothers me. Under the guidelines, there's some provisions which I think are intended to mitigate that. They're probably going to go in the other direction, but it's a real problem. I have not really thought about that. And it hurts me to defend your clients. But many of our clients, I think many of our clients come into court with, they may not be chips, but they often are sort of deficits of chips. And we ask the courts regularly to take into account that people don't have a lot of support or don't have a lot to draw on. So I think maybe sometimes the deficit of chips is in and of itself a mitigating factor, and I think that's true for a lot of our clients. I think, as I said, Judge Hayden could not have been more thoughtful and comprehensive about this sentence. I urge this court to affirm. Thank you. Mr. Meyer, you have, I think, two minutes for about to be adjourned. You probably should get about a week and a half after that. I'm going to attempt to be brief, Your Honor. Let me start with you now with this guideline. There are, I think what Ms. Arkell recognized, is there are many ways to commit this offense. One of them is assault of conduct. If the commission had selected guidelines for this offense, there is no doubt in my mind, assault would be one of them. And so the question here is, under 1B1.2A, under bony, what do you look at? The charged conduct in the offense of conviction. The charged conduct in the offense of conviction here, which is plainly in the verdict sheet, is physically assaulting the kids on at least three of the counts. And, again, we think three other of the accounts are pretty good, too. Forcing toddlers to ingest harmful substances. The assault guidelines are sufficiently analogous to those counts of conviction that within the ballpark they should apply. That's the first thing. Do you think Kauffman or Osborne would remind the argument? I don't think so, Your Honor. Because, again, even if you look at elements, even if you look at them, I think it could be a tool. Even if you do that, we're not looking for a match. We're looking for something within the ballpark. The second thing I want to address is, and let me go back just for a second, assault. The defendants actually conceded below that the assault guidelines would apply. What I think happened is they realized the cross-reference would apply, and all of a sudden they didn't want the assault guidelines to apply anymore. So if you look at pages 6083 to 84 of the appendix, 6083 to 84, and then 6438, and if you look at John's appendix, pages 8 and 11. So that's the first thing. Second, there's been a lot of talk about treating doctors. The judge relied on treating doctors. Everyone's talking about treating doctors. The treating doctors were lied to repeatedly. They were told, oh, the birth mother did this. They were told, oh, we just got custody back from the birth mother. That's why she looks like this. They were told the mother was crack addicted. They were told that the C had surgery on her lip. That's why part of it is missing. The mother was crack addicted. How would that help? Because they claimed that the reason the child was not growing. She had part of her lip surgically removed. The doctors believed this. You know why? Because they're educated. They look military. They seem like they're very with it, that they care. Those were all lies, and the doctors all said on the stand, if I had known those were lies, then, yes, I would have been very concerned about this. And, in fact, even with the lies, the doctors said, I was very concerned about this. So this reliance on the treating physicians is completely ignoring whole swaths of evidence. And they just didn't see one treating physician. They saw one that didn't tell the other, that didn't tell the third. And the only doctor, just remember this, the only doctor that saw both Joshua and C was Dr. Gutierrez, and he said, oh, my God, this looks like abuse, and immediately got some tests, and then blew the whistle on this, and that's how it ended. One person at trial testified who saw both of those kids, and that's how this ended. And then the last point I want to make is Mr. Waldman said, and I think he conceded, I'm so glad, he conceded right up here. What the judge did was said, I'm going to be like a state sentencing judge, and I'm going to impose the sentence that would be served in the state. That is legal error. ACCA does not require that. Congress does not require that. It requires that word. It requires it. It allows that. What I would say, Your Honor, is that maybe if ACCA doesn't allow it, what allows it is post-booker sentencing. But what post-booker sentencing says is you have to apply a 35 to 2 trail. You have to apply the guidelines. If you want to consider what would happen in the state, and, again, we don't think that's very important, you consider it as part of that entire analysis. Not what Mr. Waldman said, which is she was required to do that. That's what she did. That was essentially the sole factor here was what would a state court judge. A state court judge, he said, if I were a state court judge, I would give five years, and under parole that means that it would be 24 months. Congress acted in 1990. It said under 3551 it applied. ACCA convictions are sentenced according to the federal sentencing guidelines and the Sentencing Reform Act, not to impose the same punishment that would be imposed in the state. If Congress wanted to say that, they could have. They didn't. So we think that that's another error that this could be sent back to the judge to say, look, what you're supposed to be applying is federal sentencing policy. Want to consider what happens in the state? Go ahead, but you're going to have to explain very thoroughly why you're rejecting congressional policy and the sentencing commission policy in order to do that. Does this court have any other questions? If not, I would ask that this sentence be vacated and remanded for re-sentencing. Thank you, Your Honor.